[S. F. No. 21826. In Bank. Mar. 18, 1966.]

ROBERT MANJARES et al., Plaintiffs and Respondents, v. DR. ROBERT E. NEWTON et al., Defendants and Appellants.

366

William H. Stoffers, County Counsel, Allan W. Nicholson, Deputy County Counsel, and Richard H. Perry for Defendants and Appellants.

Heisler & Stewart, Francis Heisler and Charles A. Stewart for Plaintiffs and Respondents.

MOSK, J.—Defendants, members of the Board of Education of the Carmel Unified School District (hereinafter called the board), appeal from a judgment of the trial court ordering them to provide transportation to eight of the ten minor plaintiffs from their homes to their respective schools.[1] Robert and Carol Manjares, parents of seven of the children, and Marion and May Wallace, parents of the other three, represent the minor plaintiffs in this action. The issues for determination are whether a school board's decision, made without a hearing, that school buses which serve the district will not furnish transportation to certain areas in the district, is subject to judicial review and, if so, whether the trial court was correct in holding that the board abused its discretion and

---

[1] The trial court did not include in its order one of the plaintiff children, who was of kindergarten age at the time of trial and for whom special transportation arrangements would have been required, and another who was only four years old. Plaintiffs do not complain of these omissions.

acted in an arbitrary and capricious manner in refusing to provide transportation to the minor plaintiffs. As hereinafter discussed, both of these questions require an affirmative answer.

Section 16801 of the Education Code provides in part: "The governing board of any school district may provide, with the written approval of the county superintendent of schools, for the transportation of pupils to and from school whenever in the judgment of the board such transportation is advisable and good reasons exist therefor."

Plaintiffs live just off a county road in the Paloma Creek area of Monterey County. This is in the southeast corner of the school district, about 30 miles from the junior high school and about half that distance from the elementary school to which the children were assigned. For many years the district has provided bus transportation to students along certain county roads. The closest stop to plaintiffs' homes is at the Hastings Reservation, 6.2 miles away. The controversy between the parties involves the question whether the board is required to authorize transportation for this approximate 6-mile distance.[2]

Each year the board reviews existing routes and decides whether to curtail, maintain, or extend them. In the three years prior to 1963, when plaintiffs moved into the area, there was a trend toward curtailing the routes for reasons of economy. The board's policy regarding transportation is contained in section 16B of its rules and regulations, which provides that, while it is the responsibility of students and their parents to arrange the daily travel between home and school, the board may assist in transporting pupils who live beyond 2 miles from a bus stop if road conditions, pupil density, or hazardous walking conditions make it advantageous, but that some areas will not be served by buses for reasons of safety. The section also provides that, if the distance from a regular bus stop to a student's home exceeds 2 miles, payments of six cents per additional mile may be authorized in lieu of transportation.

In the summer of 1963 a family named Dudley, with five children, moved into the Paloma Creek area and requested the district superintendent of schools to provide bus service for their children. The superintendent, who himself was a

---

[2]Technically, the controversy concerns a slightly shorter distance, since the trial court's order requires that transportation be provided from a point about three-fourths of a mile from the Manjares home.

new resident in the area, agreed to do so, not realizing that section 16801 requires the board to authorize student transportation. The Manjares family moved into the area from San Jose after it learned that bus service had been authorized. Mrs. Manjares enrolled her children in the high school and the elementary school, and from September 23 until November 4, 1963, a station wagon owned by the district took the Dudley and Manjares children to the bus stop at Hastings Reservation or to their respective schools. Subsequently, it was discovered that the Dudleys did not live within the school district, and they moved to Monterey.

The Wallace family bought a ranch in the Paloma Creek section in the fall of 1963. Mr. Wallace had seen the station wagon taking the children to school on the road near their new home, and he assumed that his children would be provided with transportation. However, the service was stopped shortly after the Wallaces moved into the area, and the Wallace children never received transportation.

When the board met in September, the superintendent informed it of his action and recommended that service to plaintiffs' homes be continued. The board was "dismayed" by his action because it was apprehensive that if it extended transportation to plaintiffs, the door would be opened to demands for transportation by others who lived in parts of the county to which bus service had not previously been afforded. However, it voted to continue the matter until its next meeting. Before that date, the superintendent investigated the various bus routes in the district and, when the board met again, he recommended that the Paloma Creek route as well as three others be discontinued. The board voted to discontinue two of these routes, including Paloma Creek, but did not accept his recommendations as to the other two. It also offered to make payments of six cents a mile in lieu of transportation to the adult plaintiffs or to another person who could drive the children to the bus stop.[3] The adult plaintiffs protested the discontinuance of bus service but were informed that *financial considerations* compelled the board's action.

Plaintiffs were unable to arrange to transport their children to the bus stop or to employ anyone else to do so, although various plans to accomplish this purpose were considered.

[3]The payment offered was six cents a mile for the children of one family and, if a parent provided the transportation and was willing to carry children of another family, one cent a mile for each additional child.

Mr. Wallace volunteered to drive the children to school on his way to work and to bring them back on his way home if the district would provide him with a suitable vehicle (he had only an open truck), insurance, and expenses. The board rejected this offer because it was a deviation from policy, because it was too costly, and because Mr. Wallace's working hours were such that the children would be required to be at school about two hours each day without any adult supervision.

As a result of plaintiffs' inability to provide transportation, the children did not attend school for the remainder of the 1963-64 school year. The district superintendent recommended to the county superintendent of schools that they be excused from compulsory school attendance under section 12153 of the Education Code, which provides that students residing more than 2 miles from school shall be exempted from compulsory attendance on the written approval of the county superintendent.

In their complaint plaintiffs, after alleging their inability to secure transportation and the details of the Wallace proposal, asserted that the board's action resulted in excluding the minor plaintiffs from the public schools and in depriving them of their constitutional rights of due process of law and equal protection. They prayed for a restraining order compelling the board to furnish them with transportation to and from school.

The board demurred to the complaint, the demurrer was overruled, and it thereafter filed an answer denying the allegations of the complaint, with the exception of certain jurisdictional matters, and asserting that the board had no duty to provide the minor plaintiffs with free transportation.

The trial court treated the complaint as one sounding in mandate and, after a trial at which testimony was received from three of the adult plaintiffs, the district superintendent, and the assistant superintendent, it issued a peremptory writ of mandate commanding the board to provide transportation to eight of the minor plaintiffs to and from their respective schools, beginning with the 1964-65 school year. The court found that, although plaintiffs were offered payments in lieu of transportation, the amount offered was not sufficient for this purpose, that plaintiffs had "neither the means of transportation nor the means with which to purchase it," that the board maintains bus service to an area farther from the schools than Paloma Creek, that, although the road to the Paloma Creek area is narrow and requires careful driving at

certain points it is no more dangerous than other roads over which the board affords transportation, that defendants are financially "well able" to provide plaintiffs with bus service, and that their failure to do so prevents eight children from attending school and will do so in the future.

The court concluded that the board's action in refusing transportation was arbitrary, capricious, discriminatory, and unreasonable and deprived plaintiffs of free schooling and of due process of law and equal protection of the laws. It also found that the board's refusal to act favorably on Mr. Wallace's offer was capricious and discriminatory.

The board first contends on this appeal that the trial court erred in overruling its demurrer to the complaint. It claims that, since section 16801 of the Education Code clearly gives it discretion to determine whether or not transportation should be provided, its determination is conclusive and is not subject to review by the courts. It is pointed out that under section 1085 of the Code of Civil Procedure a writ of mandate may issue only when a petitioner has a *right* to the performance of an act and a respondent has a *duty* to perform that act, and the board asserts the plaintiffs have no right to free transportation and the board has no duty to furnish it. Two district court cases are cited in which children were injured on their way home from school and it was held that the district could not be held liable for negligence since it was under no duty to furnish transportation. (*Kerwin* v. *County of San Mateo* (1959) 176 Cal.App.2d 304, 307 [1 Cal.Rptr. 437]; *Girard* v. *Monrovia City School Dist.* (1953) 121 Cal.App.2d 737, 743 [264 P.2d 115].)

The board is, in effect, claiming that whenever an administrative body has been granted discretionary powers, the manner in which it exercises that discretion is beyond judicial review. This argument is clearly untenable. ▓ That mandate will lie whenever an administrative board has abused its discretion is a rule so well established as to be beyond question. The applicable principle was stated many years ago in *Inglin* v. *Hoppin* (1909) 156 Cal. 483, 491 [105 P. 582] : "While, of course, it is the general rule that mandamus will not lie to control the discretion of a court or officer, meaning by that that it will not lie to force the exercise of discretion in a particular manner . . . [it] will lie to correct abuses of discretion, and will lie to force a particular action by the inferior tribunal or officer, when the law clearly establishes the petitioner's right to such action." (See also authorities cited in 3 Witkin, Cal. Procedure (1954) p. 2529.) ▓ In deter-

mining whether an abuse of discretion has occurred, a court may not substitute its judgment for that of the administrative board (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834-835 [27 Cal. Rptr. 19, 377 P.2d 83]), and if reasonable minds may disagree as to the wisdom of the board's action, its determination must be upheld (*Rible* v. *Hughes* (1944) 24 Cal.2d 437, 445 [150 P.2d 455, 154 A.L.R. 137]).

We come, then, to the question whether the trial court properly concluded, under the foregoing principles, that the board's refusal to furnish transportation under the circumstances of this case amounted to an abuse of the discretion vested in it.

Since the board's determination did not involve quasi-judicial matters, no hearing was held by the board and no findings issued. As we have seen, the trial court found in favor of plaintiffs, after a full hearing at which defendants were given the opportunity to present evidence in support of the board's action. The purported reasons for its action were set forth by school officials who testified at the trial. The testimony on behalf of plaintiffs, aside from a recitation of the factual background of the controversy, related largely to their efforts to obtain transportation for their children and their inability to provide instruction at home. The only substantial issue in conflict—to be discussed hereinafter—revolved about whether the road from the Hastings Reservation to the Paloma Creek area was too hazardous for operation of a school bus. With the exception of this question, the factual context in which the case was tried did not compel the trial court to resolve conflicts in the evidence but, rather, to consider whether there were reasonable grounds for the board's refusal to provide bus service, in the light of plaintiffs' showing of need.

Mr. Manjares testified that he had nine children and was employed as a "pump man." When he moved to the Paloma Creek area in 1963 he accepted a cut in salary from $125 a week to $70 a week because he felt that the rural environment would be beneficial to his children. He had completed one year of high school. In 1964 he had only an open truck, which was not suitable to transport children, and there was no one in the vicinity who could drive the children to the nearest bus stop.

Mrs. Manjares, who had almost completed high school, testified that she could not drive. After the board discontinued bus service, the district sent the children's lessons to her by mail and she attempted to provide instruction at home. How-

ever, she was called upon to teach subjects she had not studied in school and, although she made a commendable effort, it was impossible for her to teach five grade levels in her modest four-room house and she gave up the attempt after a few weeks. When her children were transported to school, the older youngsters arose at 4:30 and were picked up by the station wagon at 6, while the younger children arose at 6:45 and left the house at 8. She had tried to arrange transportation for the children to a school located in an adjoining district, but had been unable to do so.[4]

Mr. Wallace testified that he had a third grade education and his wife had no schooling whatever. She did not drive. He related the details of his offer to drive the children to and from school without compensation if the district would supply him with a vehicle, insurance, and running expenses. Although he owned several pickup trucks and some old cars, he did not own a vehicle suitable to transport children.

The assistant superintendent of schools testified as follows:

It was not practical to extend the existing bus route, which went as far as the Hastings Reservation, to plaintiffs' homes because if this were done some of the Manjares and Wallace children would be compelled to leave home at 5:30 a.m. instead of 6 a.m. When transportation had been provided in the fall of 1963, the station wagon left Carmel Valley Village for the Paloma Creek area early in the morning and drove the Manjares and Dudley children attending the upper grades to the Hastings Reservation bus stop, where they would take the regular school bus. The driver would then return to Paloma Creek, pick up the elementary school children, and take them to their school in Carmel Valley Village. Although there was space on the regular bus to accommodate the elementary school children, the driver brought them all the way in to school since she was required to return to the village in any event.

Because a special vehicle was sent for plaintiff children, the cost of transporting them back and forth to school would have been $375 a year for each child. The average cost of transportation in the district is $49 per child, but this figure would

---

[4]Defendants brought out on cross-examination that after April 1964 Mr. Manjares had a station wagon at his disposal and that he was unemployed for a few months in the spring of 1964. Apparently they were attempting to demonstrate that during the period he was unemployed he could have driven the children to the bus stop and back. However, this could not have been viewed as a permanent solution to the problem and, on appeal, defendants do not challenge the trial court's finding that the adult plaintiffs were unable to transport the children or to arrange transportation for them.

be raised to $51 per child if bus service were extended to the Paloma Creek area. However, the district would receive $125 from the state for each child in attendance at school—a sum it would lose if they did not attend—and a portion of this could be applied to transportation expenses.

The station wagon which carried the children in 1963 could hold only seven passengers and, if the number of children attending school in the Paloma Creek area were to increase, it would be necessary to purchase a 20-passenger bus to accommodate them. A bus of this type would cost between $7,500 and $8,000. The district owns 11 buses, ranging in size from a large vehicle capable of carrying 79 children, to smaller cars which can hold only 20 children. A 20-passenger bus serves on the regular route to the Hastings Reservation.

Two other areas served by buses are approximately the same distance from the Carmel Junior High School as the Paloma Creek area. The district pays part of the cost of transporting athletic teams to other parts of the county for the purpose of engaging in competition, and automobiles are provided for some of the district's employees.

Continuing, the assistant superintendent testified that the district has an assessed valuation of $61,000,000 and a budget of $1,750,000 a year. There was a surplus of $175,000 the previous year, $80,000 of which was committed to a reserve fund for the purpose of defraying expenses from the beginning of the fiscal year on July 1 until tax revenues were received. The district had budget problems in the past but counsel had advised it not to draw on this reserve fund because the money had been raised by a special county election. A map was introduced into evidence showing that there are some areas served by county roads aside from the Paloma Creek area where children of school age live but bus service is not provided.

The district superintendent testified that two of the factors which impelled the board to refuse bus service to plaintiffs were the cost of providing such service and the danger that it would open the door to requests from families in other areas where transportation had not been previously furnished. He also testified that the 20-passenger bus which serves on the route to Hastings is not wide and is especially designed for the narrow roads in that area.

Under the circumstances of this case, we believe the trial court properly concluded that neither the cost of providing transportation to the minor plaintiffs nor the possibility that other families might demand bus service provided a rea-

sonable justification for the board's action in view of the fact that, as a consequence, eight children were denied the opportunity to attend school.

While it is conceivable that families living in other parts of the district may ask for bus service if the board extends transportation to the Paloma Creek area, we do not hold as a matter of law that the board would be required to comply with every request regardless of the individual circumstances. The most persuasive considerations compelling affirmative action in the present case are that the minor plaintiffs are deprived of an education if transportation is not authorized by the board and their parents are not qualified to teach them at home. There is no indication in the record that there are any other families in the district similarly situated. Moreover, the map introduced into evidence by the board shows that, aside from the Paloma Creek area, there are only three places in the district where children of school age live on county roads more than 2 miles from existing bus routes and where transportation is not provided.

The claim that economic considerations support the board's action is equally untenable. Examination of the testimony of the assistant superintendent indicates that the cost of $375 per child for transportation in the Paloma Creek area (less some part of $125 which the district would receive from the state if the children attended the district's schools) is calculated on the assumption that it is necessary to send a special vehicle from Carmel Valley Village to the Paloma Creek area. The assistant superintendent testified that the bus which stops at Hastings Reservation can accommodate the minor plaintiffs, but that it was not considered practical to extend the existing route because this would require plaintiff children who attended the upper grades to leave home at 5:30 instead of 6 a.m. Mrs. Manjares stated that those of her children who took the early bus arose at 4:30 a.m. and there is no indication that they and the Wallace children could not have left home a half hour earlier, if necessary. That would appear to be a modest inconvenience to endure for basic education. Had the existing route been extended, the cost of providing bus service to the Paloma Creek area would have been approximately the same as to other areas an equal distance from school.

While it is true that the district may be required to purchase another 20-passenger bus in the future to accommodate additional children in the Paloma Creek area, this problem does not differ from that which the district faces in other areas

in which there is a potential increase in the number of students to be transported.

 Additional factors which the trial court appropriately considered are that not a lone child but eight children require transportation in the Paloma Creek area, that bus service is furnished to other children who live at least as far from school as plaintiffs, and that the district pays part of the cost of transporting athletic teams to various parts of the county.

 Even if we were to assume that a special bus would be required to transport the Wallace and Manjares children and that the cost of service to them would be higher than to other sections of the district, the trial court's determination that economic factors did not justify the board's action must be upheld. The testimony regarding the district's financial resources supports the court's finding that the district is in a sound fiscal position to meet these additional expenses. Defendants do not claim otherwise, but argue that even if such financial ability exists, it was within their discretion to refuse bus service if the cost of providing it is unduly expensive when compared to general transportation costs in the district. This contention is not persuasive. Where, as here, it is shown without question that eight children are being totally deprived of an education because the board refuses to authorize transportation to school and the district is in a financial position to extend the existing bus system to include them, it is arbitrary and unreasonable to refuse to do so simply because it may be more expensive to transport these children than others in the district.

We indulge in no hyperbole to assert that society has a compelling interest in affording children an opportunity to attend school. This was evidenced more than three centuries ago, when Massachusetts provided the first public school system in 1647. (Justice Douglas, An Almanac of Liberty (1954) p. 138.) And today an education has become the *sine qua non* of useful existence. In *Brown* v. *Board of Education* (1954) 347 U.S. 483, 493 [74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180], it was said: "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening

citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." In light of the public interest in conserving the resource of young minds, we must unsympathetically examine any action of a public body which has the effect of depriving children of the opportunity to obtain an education.[5]

One other matter requires discussion. There is a conflict in the evidence regarding the quality of the road from the Hastings Reservation to plaintiffs' homes. Mr. Manjares testified that it is a good, paved road regularly maintained by the county. The assistant superintendent of schools stated, on the other hand, that it is a winding, one-lane road, about 12 feet wide at one point, that there are places where there are sharp turns, that there is a 15-foot drop from the road at one point and a 30-foot drop at another and that, if a bus were forced off the road it would fall down the bank. He also stated that although the road between Hastings Reservation and the Paloma Creek area is similar in some respects to another route over which buses are provided, there is more traffic on the Paloma Creek road. A number of pictures was introduced into evidence showing the various parts of the road described by the assistant superintendent. There is nothing in the record indicating that the assistant superintendent's evaluation of the road to plaintiffs' homes is anything more than *his* personal view, or that it was ever communicated to the board and became the board's conclusion, or, indeed, that he had ever been on the road until a few days before the trial. The trial judge commented that he was familiar with the road and that he did not consider it to be dangerous.[6] As we have seen, the court found that the road to the Paloma Creek area is no more dangerous than others over which the board maintains regular bus service.

---

[5]Nor should a child's learning be deferred. In his 1964 commencement address at the University of Chicago, President George W. Beadle said: "It has become increasingly clear that early learning is much more significant than we have previously thought. We may be missing the boat in our educational systems, for we largely ignore the most sensitive and receptive period of development."

[6]The judge stated: "Now, as far as the road is concerned, you gentlemen don't know it but I've been over that road, not recently, but I've

We need not discuss whether the trial court's determination in this regard was appropriate, since it appears that in the judgment of the *board* the road could be safely negotiated by a narrow, 20-passenger bus, such as the one on the regular route to Hastings Reservation. This conclusion is suggested by the testimony of the superintendent, who related the reasons for the board's action in refusing bus service, although his statements on the subject are far from unequivocal.[7]

Despite purported concern here for safety, the actual basis of the board's action is plainly indicated in an allegation made in a petition for a writ of supersedeas filed on its behalf in the District Court of Appeal. The petition alleges: "That it is the best judgment of the Governing Board of the CARMEL UNIFIED SCHOOL DISTRICT, Appellants herein, that in order to *safely* comply with the mandatory order of the Court as in said peremptory writ of mandate contained it will be necessary for the school district to expend tax monies for the acquisition of an additional school vehicle at an estimated cost of between $7,500.00 and $8,000.00." (Italics added.) And one

---

been over it two or three times in former years. To be very frank with you, it isn't a difficult road for anything as far as I'm concerned. I mean, I don't think you've got a problem involving the quality of the road there. There's much worse roads than that."

[7] The relevant excerpts from the superintendent's testimony are as follows:

"Q. Anything wrong with the road?

"A. Yes sir. . . . From the standpoint of driving a school bus, our school bus, the one we run out there is a narrow bus designed especially for that purpose. The board some years ago bought that bus rather than to use the typical wider bus for driving out there. I've driven out there, I've measured the roads in places. I found clear roads in places, some quite narrow other places. There are ridges on the side of the road so that if a car came around a curve in a hurry and hit a bus, the bus would tip over and over down the side. Now, perhaps I'm looking at it with the eyes of an Easterner who isn't used to that kind of transportation. I admit it's a judgmental thing.

"Q. The very danger you express is far more prevalent right up within two or three miles of the Tularcitos School [the elementary school], is it not?

"A. Except that this is the reason we continue to use this 20-passenger bus rather than a larger bus on that road. We're trying to make the danger as little as possible. We don't want to add to the danger any more than we have to.

"Q. Mr. Bair, you found road conditions between Hastings and Paloma Creek rather dangerous for the bus driver to drive?

"A. This is correct.

"Q. Now, could you tell us what was or what were the reasons why the school board—which I presume accepted or received your recommendations—voted against maintaining this bus service or station wagon service that you provided for the Paloma Creek area?

"A. I think I can give you some of the reasons; I'm not sure I

of the board's briefs states: "Moreover, the record indicates that in order to *safely* transport the Respondents it would be necessary for the Appellant District to purchase a new bus involving a capital outlay of some $7,000.00 to $8,000.00. This factor too was considered by the Board in refusing to 'continue' transportation to the Respondents.'' (Italics added.) (Ans. to petn. for rehg. in District Court of Appeal, p. 5.)[8] Thus it appears that the board's denial of service was based not on inability to provide safe transportation, but on the economic factors in doing so. We have previously disposed of the budgetary aspect.

The record supports the trial court's conclusion that under the circumstances of this case there was no reasonable basis for the board's refusal to provide transportation to the minor plaintiffs. We therefore find it unnecessary to consider other contentions made by plaintiffs, including their claim that the board's action deprived them of due process and equal protection.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., and Peek, J., concurred.

BURKE, J.—I dissent. I would reverse the judgment for the reasons expressed by Mr. Presiding Justice Draper in the opinion prepared by him for the District Court of Appeal in *Manjares* v. *Newton* (Cal.App.) 44 Cal.Rptr. 343. As declared in that opinion, "There is testimony that reasons of safety, economy and policy support the board's decision. The contrary evidence, given its utmost effect, shows only that there may be some basis for contrary conclusions on these questions. But under the statute [Ed. Code, § 16801], the decision is for the board, and not the courts. At most, the wisdom of the board's decision is reasonably debatable. That is not enough to warrant the finding [of abuse of discretion] here made."

McComb, J., concurred.

---

know them all.

". . . . . . . . . . . . .
"A. I think I've commented on the safety factor. I think I've commented on the fact that if you extend the route in one way you also open the way to extending it in other areas. I think the economy factor was the third factor. Possibly other factors I'm not aware of."

[8]In this brief, the board also relies on the fact that there is evidence in the record to show the road is dangerous. They rely on a statement by the assistant superintendent to the effect that it is hazardous to send *large* buses over the road. As pointed out above, the assistant superintendent testified as to his opinion regarding the character of the road, but there is no evidence that his opinion was communicated to the board or that the board considered the road dangerous for a 20-passenger bus.