Opinion
MARSHALL, P. J.
This appeal is taken by the People from judgments of dismissal which were entered following orders of the trial court sustaining defendants’ demurrers as to all counts of misdemeanor complaints based upon violations of section 1707.1 of the Health and *Supp. 44 Safety Code[1] in three consolidated cases.[2] The trial court sustained defendants’ demurrers on the ground that section 1707.1 was unconstitutional under the United States Constitution and the California Constitution.
Inasmuch as the trial court did not state upon what ground or grounds it held section 1707.1 constitutionally infirm, we will address ourselves seriatim to each argument tendered on behalf of defendants. So doing, we hold that the statute is constitutional, and, accordingly, we reverse the judgments.
Vagueness
Defendants (hereinafter respondents) contend,[3] inter alia, that the statute in question is vague, confusing, and lacking in any ascertain *Supp. 45 able standard of prohibited conduct in violation of the due process clause, article I, section 13, clause 6, of the Constitution of the State “of California, and of the due process clause of the Fourteenth Amendment of the United States Constitution. Section 1707.1 of the Health and Safety Code prohibits among other things the prescribing, selling, or administering of any unapproved “drug, medicine, compound or device to be used in the diagnosis, treatment, alleviation or cure of cancer [4] .. .” unless an application with respect thereto has been approved by federal or state authorities.
It is argued that the phrase “drug, medicine, compound or device” is vague in that it is not clear, due to the inclusion of the word “compound,” whether the statute applies to foods and to the vitamins that occur naturally in foods, or whether it is limited to “drugs” that are not “foods.”[5]
Where a statute is reasonably clear, it is not unconstitutionally vague. “The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. ‘No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids . . . “a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.” ’ (Lanzetta v. New Jersey, 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888, 890]; see also Connally v. General Const. Co., 269 U.S. 385, 391 .. . .)” {In re Newbern (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116], quoted with approval in People v. Belous (1969) 71 Cal.2d 954, 960 [80 Cal.Rptr. 354, 458 P.2d 194]; cf. 13 Cal.Jur.3d, § 365, p. 678.) In the interpretation of legislative enactments, statutory language should be construed in accordance with the ordinary meaning *Supp. 46 of the language used. {Pac. Gas & E. Co. v. Shasta Dam etc. Dist. (1955) 135 Cal.App.2d 463, 468 [287 P.2d 841].) Except where clearly indicated otherwise, the nontechnical words of a statute are to be given their usual, ordinary, and commonly understood meaning. (Labarthe v. McRae (1939) 35 Cal.App.2d 734, 738 [97 P.2d 251].) Inasmuch as the Legislature has not provided a technical definition of the word “compound,”[6] we must employ its dictionary meaning. According to Webster, a “compound,” in the chemical sense, is “a chemically distinct substance formed by union of two or more ingredients ... in definite proportion by weight and with definite structural arrangement.” (Webster’s Third New Internat. Diet.)
Thus, it is clear that while those in the medical field, such as respondents Privitera and Leslie, may indeed have a particular familiarity with the word, “compound” it is a word in common usage and one whose definition would not elude the layman of ordinary intelligence. The accepted dictionary definition supports respondents’ own conclusion that the term is broad enough to include foods as well as drugs. We find the argument made by amici to the effect that one is forced to speculate whether foods are compounds to be without merit. Particular words in a statute must be given the meaning intended by the Legislature {Noble v. Key System, Ltd. (1935) 10 Cal.App.2d 132 [51 P.2d 887]) in light of the context (Southern Pacific Co. v. Riverside (1939) 35 Cal.App.2d 380 [95 P.2d 688]) and the nature and purpose of the statute (Johnstone v. Richardson (1951) 103 Cal.App.2d 41 [229 P.2d 9]). Both the plain meaning of the language used in section 1707.1 and the statutory context in which that section is found, clearly indicate a legislative intent that the term “compound” be read in its broadest sense.
Furthermore, if the Legislature intended to regulate only the use of drugs in the treatment of cancer the words “medicine, compound or device” would not have been included in section 1707.1.
Section 1704 subdivision (d)[7] of the Health and Safety Code provides that the State Department of Health shall “[a]dopt a regulation prohibiting the prescription, administration, sale or other distribution of *Supp. 47 any drug, substance, or device found to be harmful or of no value in the diagnosis, prevention or treatment of cancer.” (Italics supplied.) Such language makes it all the more clear that the Legislature meant section 1707.1 to include more than drugs.
That the intent of the Legislature was to prohibit not only the use of potentially harmful substances such as toxic drugs in the treatment of cancer but also the administering of harmless but ineffective placebos including “foods”[8] is certainly the understanding of the Department of Health. In its regulation contained in title 17, section 10400.1, the department expressly declares the laetriles[9] to be of no value. It further states that their use might well be dangerous because “acceptable, modern, curative methods (surgery or radiation) would thereby be delayed potentially until such time as metastases had occurred and the cancer therefore might no longer be curable. In late disease palliative effect is lacking.” We have no doubt that “men of common intelligence” would interpret section 1707.1, as has the Department of Health, to apply to compounds such as laetriles.
Respondents suggest that any direct “treatment” or “alleviation” of a cancerous condition through an improvement in a patient’s general health due to the use of laetriles could subject the prescribing physician and the dispensing pharmacist to criminal liability. This argument is sophistic. Section 1707.1 is not directed at the prevention of any tangential beneficial effect on cancer cells through the use of unapproved substances. The section declares that it is unlawful to use unapproved substances “ in the diagnoses, treatment, alleviation or cure of cancer____” (Italics added.) The clear thrust of the statute is to make unlawful the use of unapproved substances for the purpose of treating cancer. In what manner a particular cancerous condition is affected, if at all, by the administration of such substances is not relevant to a determination of whether there has been a violation of section 1707.1. The trial court must determine the intent of the physician in prescribing the unapproved substances before guilt can be found. The issue is: Did the doctor intend to treat cancerl While this may present a difficult factual determination at the trial level, the need for such inquiry will not support a finding of statutory vagueness.
*Supp. 48 Overbreadth
Respondents assert that section 1707.1 is overbroad, arbitrary, unreasonable and in excess of the constitutional power of the Legislature in that it “expressly and explicitly prohibits the alleviation or cure of cancer” through the use of unapproved substances. In arguing over-breadth, respondents postulate a situation where (a) “[t]he authorities may have no knowledge concerning a new substance; or if they have heard about such a substance, they may not have had time to investigate and give approval thereto . . . .’’.or, (b) a situation where “[t]he authorities may have investigated a substance, but erroneously found that it is ... of no value in the . . . treatment . . ■. of cancer.” (Italics in original.)
Such postulates, true or not, are not relevant to the issue here, the constitutionality of section 1707.1. Assuming arguendo the truth of either or both of the postulates, the remedy of respondents would lie not in an attack upon the statute but in a mandamus proceeding to compel performance by the Department of Health of a clear duty: “ . . . That mandate will lie whenever an administrative board has abused its discretion is a rule so well established as to be beyond question. The applicable principle was stated many years ago in Inglin v. Hoppin (1909) 156 Cal. 483, 491 [105 P. 582]: ‘While, of course, it is the general rule that mandamus will not lie to control the discretion of a court or officer, meaning by that that it will not lie to force the exercise of discretion in a particular manner . . . [it] will lie to correct abuses of discretion, and will lie to force a particular action by the inferior tribunal or officer, when the law clearly establishes the petitioner’s right to such action.’ ” (Manjares v. Newton (1966) 64 Cal.2d 365, 370 [49 Cal.Rptr. 805, 411 P.2d 901]; see also Consolidated Printing & Pub. Co. v. Allen (1941) 18 Cal.2d 63, 66 [112 P.2d 884]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 77, p. 3854.)
The announced legislative purpose behind the enactment of section 1707.1 is expressly stated in section 1700, Health and Safety Code.[10] Section 1707.1 and its companion sections are intended to protect an unsophisticated and unsuspecting public from those individuals who would misrepresent the efficacy of “alleged cancer remedies” thereby *Supp. 49 encouraging cancer victims to forego accepted modes of treatment and waste money and precious time on the unapproved methods. The language of section 1707.1 is intentionally broad: the section applies to all persons, not just those who are members of the medical profession. Further, the section applies to all unapproved substances, not just those proven harmful but also those not proven effective. However, section 1707.1 is not without limitation for it prohibits only that which has not had prior scrutiny and approval.
The state’s power to enact this type of prohibition is both justifiable and necessary. As the United States Supreme Court has declared: “It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state’s police power. The state’s discretion in that field extends naturally to the regulation of all professions concerned with health.” (Barsky v. Board of Regents (1954) 347 U.S. 442, 449 [98 L.Ed. 829, 838, 74 S.Ct. 650].) The State Supreme Court has likewise held that “[t]he Legislature has the power to regulate the practice of a profession which affects the public health and safety.” (People v. Nunn (1956) 46 Cal.2d 460, 469 [296 P.2d 813].)
State regulation of drugs and other pharmacological substances has had prior judicial review and it has been held that “the right of the state to regulate the administration of drugs is beyond question.” {Blinder v. Division of Narcotic Enforcement (1972) 25 Cal.App.3d 174, *Supp. 50 181 [101 Cal.Rptr. 635].) The United States Supreme Court has noted that “[t]he determination whether a drug is generally recognized as safe and effective ... necessarily implicates complex chemical and pharmacological considerations.” (Weinberger v. Bentex Pharmaceuticals, Inc. (1973) 412 U.S. 645, 653-654 [37 L.Ed.2d 235, 242, 93 S.Ct. 2488].) The court in a companion (Weinberger)[11] case dealt with 21 United States Code section 355(a), a statute analogous to section 1707.1. Section 355(a) provides that: “No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug.” The Weinberger court dealt with the constitutionality of such statute (p. 622 [37 L.Ed.2d p. 219]): “But Congress surely has great leeway in setting standards for releasing on the public, drugs which may well be miracles or, on the other hand, merely easy money-making schemes through use of fraudulent articles labeled in mysterious scientific dress. The standard of ‘well-controlled investigations’ particularized by the regulations is a protective measure designed to ferret out those drugs for which there is no affirmative, reliable evidence of effectiveness. The drug manufacturers have full and precise notice of the evidence they must present to sustain their NDA’s [New Drug Applications], and under these circumstances we find FDA hearing regulations unexceptionable on any statutory or constitutional ground.”
For analogous reasons we reach the same conclusion with respect to section 1707.1 as did the Supreme Court in its consideration of the federal statute and its implementing regulations. We therefore hold that section 1707.1 is not unconstitutionally overbroad.
The court in Weinberger (412 U.S. at p. 619 [37 L.Ed.2d at p. 217]) indicated that, in passing upon the safety and efficacy of new drugs, strict scientific standards must be employed and not “anecdotal evidence indicating that doctors ‘believe’ in the efficacy of a drug.” A California Court of Appeal, in discussing the federal law to which section 1707.1 refers, offered this commentary: “We think the purpose of section 355 (b)(1) [of the Federal Food, Drug and Cosmetic Act] is to require submission of all relevant data bearing upon the safety of the drug proposed to be marketed, and that the question of the Adequacy of such tests and of the data submitted is strictly for the determination of the administrative agency.” (Toole v. Richardson-Merrell, Inc. (1967) 251 Cal.App.2d 689, 705 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) We find the *Supp. 51 purpose behind section 1707.1 and its companion sections to be identical to the federal law.
Respondents argue that “[wjhere scientists and medical authorities are not in agreement the State has no business taking sides in the controversy.” However, the accepted test under the federal scheme is to the contrary: “Where there is a genuine difference of medical opinion among the experts on the question of whether a drug is generally recognized as safe for the treatment of a particular disease, it must be concluded that the drug is not generally recognized as safe for the use in the treatment of that disease.” (United States v. Article of Drug, etc. (N.D.Ga. 1968) 294 F.Supp. 1307, 1311.) Under the state regulatory scheme, where such a difference of medical opinion exists as to the safety or efficacy of a substance for the treatment of a particular disease, nonapproval of that substance for that purpose is permissible under the police power of the state to protect the public health and guard against fraud in the medical professions.[12] The exercise of such police power is more strongly compelled by the further fact that such employment of nonefficacious substances delays the use of the methods whose curative powers have been established. In cancer, such delay can be and is fatal.
Privacy
The respondents contend that the expanding concept of the “right to privacy” includes the right of the physician to prescribe, the right of the pharmacist to dispense, and the right of the patient to take any drug or medicine on the market and that the state would have to show a “compelling interest” in enacting a regulation such as section 1707.1 which places limitations on the exercise of these rights.
Respondents, in arguing the lack of such a compelling state interest, draw an analogy between the instant case and the decision in Roe v. Wade (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]. They cite three “basic areas of judicial concern” enunciated in that case which, they contend, have equal applicability to the case sub judice. The first such area is that of a statute which is constitutionally overbroad due to the lack of a “proper State purpose” for the legislation. Our foregoing discussion of “overbreadth,” should make clear that a requisite “proper State purpose” is the basis of section 1707.1. The second area noted is where a lack of consensus exists among medical experts concerning the *Supp. 52 appropriate remedial procedures or curative techniques to be employed in a particular situation. United States v. An Article, supra, discussed in the prior section on “overbreadth,” refutes the respondents. As to the third area, the court in Roe v. Wade was concerned with the attempt, of the state to protect the public from medical procedures (abortion) that are not more hazardous to the patient than the alternative of normal pregnancy. However, the California Legislature, in enacting the statutory scheme of cancer regulations, made the implicit finding that alleged but ineffective cancer remedies are more hazardous to the patient than the state-sanctioned alternatives. We believe such finding to be reasonable. One desperate for a cure but who seeks to avoid necessary surgery because it is disfiguring, necessary radiation because it is debilitating or necessary chemotherapy because it is toxic, might in his extremity employ substances which are represented to be both harmless and curative. Knowing such propensity of these seriously ill, the Legislature exercised its police power to protect its citizens from the allegedly easier but fallacious cure.
Illustrative of the tragic results sought to be prevented by the Legislature are the two Phillips cases, People v. Phillips (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353] and People v. Phillips (1969) 270 Cal.App.2d 381 [75. Cal.Rptr. 720, 45 A.L.R.3d 105]. Both cases grew out of the same factual situation: a child with a fast growing cancer was denied life-prolonging surgery because the parents were persuaded that other means to alleviate the disease were available. After treatment by nonsurgical techniques, including pills and medicines, a Mexican herbal drug known as “yerba mansa,” and Christian Science, the child died. The defendant, a “Doctor of Chiropractic,” testified that he sought “to give ‘supportive’ care to the body as a whole,” not “ ‘treat’ cancer as such.” (People v. Phillips (1966) supra, 64 Cal.2d at pp. 576-579; People v. Phillips (1969) supra, 270 Cal.App.2d at p. 384.) The first Phillips case, decided one year before the enactment of section 1707.1, is an example of the kind of tragedy which the state has a compelling interest h> prevent.
Equal Protection
Respondents’ final argument is that section 1707.1 denies and deprives cancer patients of equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution in that the statute prohibits the prescription of laetriles for cancer patients while *Supp. 53 placing no such stricture on the use of the substances as dietary supplements by persons not afflicted with cancer.
The contention is without merit. As we stated in our discussion of “vagueness,” section 1707.1 does not prohibit the consumption of laetriles by cancer patients but rather makes criminal the offering of those substances for the purpose of treating cancer.
If despite this distinction respondents contend that the legislative inquiry into the purpose for the prescription of laetriles in the case of cancer sufferers somehow violates equal protection, this argument is likewise untenable. The Constitution does not require strict uniformity in the treatment of all persons but only that there be a rational and reasonable basis for the classification of persons and for the disparate treatment of persons according to such classification. In Blinder v. Division of Narcotic Enforcement (1972) 25 Cal.App.3d 174, 184 [101 Cal.Rptr. 635], the contention was made that while the use of methadone by narcotic addicts was restricted, no such restriction was imposed on those suffering from other maladies. The court responded that “Courts can take judicial notice of the physical, mental and moral destruction that results from narcotic addiction. It was therefore reasonable for the Legislature to conclude that treatment of this disease by the use of narcotics should be subject to certain specific requirements for the treatment of such addiction. Addict plaintiffs have failed to allege facts demonstrating that the Legislature acted in a palpably arbitrary manner, and that the permissible use, if any, of methadone in the treatment of other ailments different from that permitted for the treatment of narcotic addiction is an unreasonable classification. We therefore perceive no violation of the guaranty of the equal protection of the laws.” {Id., at p. 185.) Similarly here we take judicial notice of the terrible suffering of cancer patients and the gravity of their disease, and recognize that they therefore are particularly susceptible to representations that facile “cures” exist, especially when such representations are made by those in whom they have placed their trust. Under such circumstances, we find that the Legislature did not transgress the Fourteenth Amendment mandate of equal ■ protection but instead properly exercised its power to protect victims of the disease by enactment of section 1707.1 of the Health and Safety Code from those who would prey upon them.
*Supp. 54 Disposition
For the foregoing reasons, the judgments appealed from are reversed.
Cole, J., concurred.
Alarcon, J., did not participate therein.

Section 1707.1 reads as follows:
“The sale, offering for sale, holding for sale, delivering, giving away, prescribing or administering of any drug, medicine, compound or device to be used in the diagnosis, treatment, alleviation or cure of cancer is unlawful and prohibited unless (1) an application with respect thereto has been approved under Section 505 of the Federal Food, Drug and Cosmetic Act, or (2) there has been approved an application filed with the board setting forth:
“(a) Full reports of investigations which have been made to show whether or not such drug, medicine, compound or device is safe for such use, and whether such drug, medicine, compound or device is effective in such use;
“(b) A full list of the articles used as components of such drug, medicine, compound or device;
“(c) A full statement of the composition of such drug, medicine, compound or device;
“(d) A full description of the methods used in, and the facilities and controls used for, the manufacture, processing and packing of such drug, medicine or compound or in the case of a device, a full statement of its composition, properties and construction and the principle or principles of its operation;
“(e) Such samples of such drug, medicine, compound or device and of the articles used as components of the drug, medicine, compound or device as the board may require; and
“(0 Specimens of the labeling and advertising proposed to be used for such drug, medicine, compound or device.”

In case M-l 11824 (Crim.A. No. 13451) defendant Carroll R. Leslie was charged in counts I and II with violations of section 1707.1 and in counts III and IV with violations of section 26463 subdivision (e) of the Health and Safety Code. In case M-l 11825 (Crim.A. No. 13450) defendant James R. Privitera was charged in counts I through VII with violations of section 1707.1. In case M-l 18066 (Crim.A. No. 13449) defendants Privitera and Leslie were jointly charged with three counts of violating section 1707.1. On October 23, 1974, all three cases were consolidated. On February 3, 1975, all counts against defendants were dismissed except for counts III and IV against defendant Leslie in M-l 11824.

We have considered not only defendants’ points and authorities in support of their demurrer and defendants’ briefs on appeal but also briefs amici curiae submitted on behalf of defendants by Attorneys John Joseph Matonis of Washington, D.C. and John *Supp. 45 Rakus of Sacramento, California for the International Association of Cancer Victims and Friends and for Citizens for Truth in Nutrition; by Attorneys Richard K. Stacer and Michael Pancer of San Diego, California for the American Civil Liberties Union; by Attorneys Kirkpatrick W. Billing of Chicago, Illinois and William R. Hose, Jr. of Downey, California for the National Health Federation; and by Dean Burk for the Dean Burk Foundation, Inc. of Washington, D.C.

Defendants are charged with administering amygdalin, hydrazine sulfate, calcium pangamate, Koch agents, all otherwise termed betacyanogenetic glucosides or laetriles.

Amici make this argument. Respondents contend that the word “compound” is broad enough to include foods, components of foods such as vitamins, and any simple drug, such as aspirin.

The term is not defined in chapter 7 of the Health and Safety Code, title 17 of the California Administrative Code, nor by the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355 etseq.).

This section was enacted in 1959 along with section 1707.1 as part of the comprehensive “California Cancer Law.”

We do not reach respondents’ contention that amygdalin, hydrazine sulfate, and calcium pangamate, commonly known as “laetriles,” are food substances. The relevance and the ultimate truth of this assertion are matters to be determined at least initially by a trial court.

See definition of term in footnote 4, ante.

“The effective diagnosis, care, treatment or cure of persons suffering from cancer is of paramount public importance. Vital statistics indicate that approximately 16 percent of the total deaths in the United States annually result from one or another of the forms of cancer. It is established that accurate and early diagnosis of many forms of cancer, followed by prompt application of methods of treatment which are scientifically proven. *Supp. 49 either materially reduces the likelihood of death from cancer or may materially prolong the useful life of individuals suffering therefrom.
“Despite intensive campaigns of public education, there is a lack of adequate and accurate information among the public with respect to presently proven methods for the diagnosis, treatment, and cure of cancer. Various persons in this State have represented and continue to represent themselves as possessing medicines, methods, techniques, skills, or devices for the effective diagnosis, treatment, or cure of cancer, which representations are misleading to the public, with the result that large numbers of the public, relying on such representations, needlessly die of cancer, and substantial amounts of the savings of individuals and families relying on such representations are needlessly wasted.
“It is, therefore, in the public interest that the public be afforded full and accurate knowledge as to the facilities and methods for the diagnosis, treatment, and cure of cancer available in this State and that to that end there be provided means for testing and investigating the value or lack thereof of alleged cancer remedies, devices, drugs, or compounds, and informing the public of the facts found, and protecting the public from misrepresentation in such matters.
“The importance of continuing scientific research to determine the cause or cure of cancer is recognized, and the department shall administer this chapter with due regard for the importance of bona fide scientific research and the clinical testing in hospitals, clinics, or similar institutions of new drugs or compounds.”

Weinberger v. Hynson, Westcott & Dunning (1973) 412 U.S. 609, 622 [37 L.Ed.2d 207, 219,93 S.Ct. 2469].

Blinder v. Division of Narcotic Enforcement (1972) 25 Cal.App.3d 174, 179, 180 [101 Cal.Rptr. 635].