[No. A073109. First Dist., Div. Five. Oct. 17, 1996.]

HELENA F., a Minor, etc., et al., Plaintiffs and Appellants, v.
WEST CONTRA COSTA UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

[Opinion certified for partial publication.[1]]

[1]Pursuant to California Rules of Court, rule 976.1, parts II and III of this opinion are not certified for publication.

1794

COUNSEL

Irma D. Herrera, Deborah Escobedo, Peter D. Roos, Nossaman, Guthner, Knox & Elliott, Kurt W. Melchior and Patrick J. Richard, for Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Paul M. Loya and Marleen L. Sacks for Defendants and Respondents.

## OPINION

HANING, J.—Plaintiffs/appellants Helena F. et al., through their guardians ad litem,[2] appeal a judgment denying them injunctive and declaratory relief in their mandamus action (Code Civ. Proc.,[3] § 1085) against defendants/respondents West Contra Costa Unified School District et al. (the district).[4] They contend the district's policy and practice concerning placement of students for whom space is unavailable at their school of residence constitutes an abuse of discretion and violates due process. We affirm.

## BACKGROUND

Each of the district's 38 elementary schools has its own geographical "attendance zone." The schools are grouped into three larger geographical areas called areas I, II, and III, each with its own director. Parents are required to enroll kindergarten or new-to-the-district students in their school of residence, i.e., the school situated in the attendance zone in which they reside. Students who cannot enroll in their school of residence due to lack of space are classified as displaced students, placed on the waiting list of their school of residence and given first priority for admission when space becomes available. In the interim the residence school's principal or secretary contacts neighboring schools to see if space is available. If no space is available in a neighboring school, the matter is referred to the appropriate area director, who informs the student's family regarding placement in an alternate school in the district. The district's goal is to place such students in an alternate school within two days, but it is not always successful in doing so. To reduce the number of displaced students the district has taken such measures as combining classes, maximizing the use of a school's existing building, adding extra teachers (space permitting) and portable classrooms, and constructing new schools. If the district were to arbitrarily increase class size to accommodate all students in a particular attendance zone, it would be in violation of its contract with the teachers union and subject to state penalties for exceeding state-mandated limits on class size.

If a parent rejects the offered alternate school, the area director suggests independent home study as an interim measure. Reasons for rejection of the

---

[2] Other minor plaintiffs/appellants are Stephanie K., Mariano F., and Cristina F. Victoria K. and Esperanza F. are taxpayer plaintiffs/appellants as well as guardians ad litem.

[3] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

[4] Other defendants/respondents are Dr. Herbert M. Cole, Jr., superintendent, the Board of Trustees of the West Contra Costa Unified School District and its members Diana Easton, Karen Ortega, Karen Leong Fenton, Charles Ramsey and Woody Snodgrass.

alternate school include safety concerns, transportation difficulties, desire to keep siblings at the same school, and dislike of the alternate school's staff or program.

The preferred time for kindergarten enrollment is the March preceding the next school year, e.g., March 1995 for the 1995-1996 school year. Under an open enrollment procedure, students may apply in February preceding the next school year for a transfer to a school other than their school of residence. Once students have transferred to an "outside" school it becomes their school of residence and they may not be forced to leave it to accommodate a student who has moved into the school's attendance zone. Failure to seek enrollment in February or March does not preclude students from seeking enrollment at their school of residence throughout the school year. Students who seek enrollment after the start of the school year are classified as "late enrollees."

Appellants Helena and Stephanie are stepsisters. In September 1992, when they were second graders, they moved after the school year started from the Bayview School attendance zone into the Ford School attendance zone. They registered at Ford School on September 8, but were put on a waiting list because its second grade was filled. Their mother/stepmother, appellant Victoria K., was informed that two separate schools each had one available place, but she declined the offer because she did not want the girls in different schools. On October 22 the girls were enrolled in independent home study. On January 13, 1993, and February 8, 1993, respectively, Stephanie and Helena were enrolled at Ford School. In February 1994 they moved from the Ford School attendance zone into the Lake School attendance zone. The Lake School was filled when they registered on February 3, 1994, and Victoria K. again declined the offer to send them to separate schools because she did not want them separated, lacked sufficient funds for bus fare, and could not have walked them to the bus stop in any case because she was preparing for major surgery. Helena and Stephanie were enrolled at Lake School on February 8, 1994.

Appellant Cristina moved in November 1992 as a second grader from San Francisco into the Downer School attendance zone. When she registered at Downer School on November 30, 1992, and was told it was filled, her mother, appellant Esperanza F., informed the district she was not interested in any alternate schools because she and her husband both worked and were

unable to provide transportation. Cristina was enrolled at Downer School on December 9, 1992.[5]

According to their complaint, appellants belong to racial or "national origin" minorities and are from low-income families. Their action sought a writ of mandate and an injunction ordering the district to abandon its policy of delaying the enrollment of qualified children, to cease placing children on independent home study when their school of residence is filled, to immediately enroll all children currently on an enrollment waiting list in a full-time educational program, and to compensate appellants and all similarly situated children for educational services lost as a result of exclusion from school. Appellants also sought a declaration that the district's practice of wait-listing qualified children on the ground of overcrowding violates due process, the state constitutional right to free schools (Cal. Const., art. IX, § 5), and equal protection.

The trial court's statement of decision makes the following findings: The district is unable to accept all late enrollees when classes are already filled to capacity. Late enrollees are placed on a waiting list and offered alternate schools without district-provided transportation. In the 1994-1995 school year the district had 4,163 late enrollees, of whom 1,045 were unable to enroll in their school of residence. The latter group was enrolled in alternate schools, with 215 students enrolled more than 1 week after seeking enrollment. The district's failure to provide transportation to these students did not result in their inability to attend the alternate schools offered them. No student was offered independent home study without also being offered an alternate school. The policy requiring students to attend alternate schools while on a waiting list for their school of residence does not have a disparate impact on any racial, ethnic or economic group because the policy is applied to all students. There is no statistical difference between the racial and ethnic makeup of the wait-listed group and the late-enrollee group.

The court denied appellants the relief they sought and entered judgment for the district, from which this appeal is taken.

DISCUSSION

I

Appellants' essential contention is that the district's policy concerning assignment of displaced students violates their constitutional right to a

---

[5]Mariano, Cristina's brother, was a named plaintiff and alleged that he was denied immediate enrollment at Helms Middle School. Although plaintiffs' attorney agreed at trial that the allegations were restricted to elementary school students, he is included in the judgment and is a named appellant.

free public education, and therefore injunctive relief is necessary to compel the district to comply with its constitutional obligation to provide this education.

At the outset we emphasize that this case was tried and decided below as one involving students who were denied *immediate* entry into their school of residence because of late enrollment and classrooms operating at maximum capacity. Appellants contended that placing them in alternate schools until space in their school of residence was available violated their state constitutional right of free public education. It was *not* tried on the basis that any students were denied entry into the public school system.

■ A writ of mandate will lie "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station" (§ 1085) in cases "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (§ 1086.) It does not lie to control discretion conferred upon a public agency. (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193].) "Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation]. [Citation.]" (*Ibid.*)

Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. (*Manjares* v. *Newton* (1966) 64 Cal.2d 365, 370 [49 Cal.Rptr. 805, 411 P.2d 901] (*Manjares*).) In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. (*Id.* at pp. 370-371.)

■ In an appeal from a traditional mandate proceeding reviewing an agency's policy decisions (§ 1085), the trial court's findings as to foundational factual matters are conclusive if supported by substantial evidence. Thereafter, the appellate court performs essentially the same function as the trial court—it determines if the agency's decision was arbitrary, capricious or entirely lacking in evidentiary support, contrary to established public policy, unlawful or procedurally unfair. (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 386-387 [146 Cal.Rptr. 892].)

■ Article IX, section 5 of the California Constitution states that the Legislature "shall provide for a system of common schools by which a free

school shall be kept up and supported in each district by at least six months in every year . . . ." Although appellants contend the district violated their constitutional right to a free public education, the present record does not demonstrate that the district deprived the children of a free public education; it demonstrates only that *late enrollees* were denied *immediate* entry into the school of their choice. The obligation to provide free education does not encompass a duty to provide schools that are geographically convenient to the parent. (See *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 959, fn. 29 [92 Cal.Rptr. 309, 479 P.2d 669] (*S.F. Unified*).)

This record contains substantial evidence to support the trial court's implied finding that the district's policy did not completely deny appellants access to district schools during their period of displacement. Although appellants may have rejected the alternate schools offered them, the offers were made. Insofar as they were not denied a right to receive a government benefit, no due process right is implicated. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 207 [124 Cal.Rptr. 14, 539 P.2d 774].)

■ Appellants argue that the district's policy constitutes an abuse of discretion because the assignment of a displaced student to an alternate school without regard to the student's ability to attend that school is an unreasonable implementation of attendance zones. It supports its argument with language from *S.F. Unified, supra,* 3 Cal.3d at page 952: " 'A local board of education has power, in the exercise of reasonable discretion, to establish school attendance zones within the district, to determine the area that a particular school shall serve, and to require the students in the area to attend that school.' [Citations.]" However, as already pointed out, *S.F. Unified* upholds the right of a district to assign students to schools beyond walking distance of home, a holding necessarily incorporating a conclusion that geographically distant school assignments are not per se unreasonable attendance zones.

Appellants' reliance on *Piper* v. *Big Pine School Dist.* (1924) 193 Cal. 664 [226 P. 926] for the proposition that financial hardship does not absolve the district of its obligation to provide free education does not aid them here. *Piper* held that a school district could not exclude a Native American child simply because the federal government provided separate educational facilities, and it would strain the district's budget to admit all Native American children who applied for enrollment. *Piper* involved a complete denial of state education, whereas the present record demonstrates only a delay of enrollment into the school of the parents' choice.

Appellants also rely on *Manjares, supra,* 64 Cal.2d 365 to support their contention that the policy is an abuse of the board's discretion. In *Manjares,*

8 students living 15 (elementary) or 30 (high school) miles from their assigned schools were originally provided door-to-door transportation by the district. Ostensibly for financial considerations, the district school board discontinued this transportation, making the closest bus pick-up point 6.2 miles from their homes. The students were unable to arrange their own transportation over this distance. The trial court concluded that the board's refusal to provide transportation to these students was an abuse of discretion because it provided transportation to areas even farther than these students' neighborhood and over equally dangerous roads, it was financially able to provide them transportation, and its failure to do so prevented the students from attending school, thereby depriving them of free schooling. The Supreme Court held that the record supported the trial court's conclusions that under the circumstances of the case there was no reasonable basis for the board's refusal to provide transportation.

*Manjares* is factually distinguishable. First, it was concerned with the application of a specific statute that permits a school board to provide transportation to and from school when the board believes such transportation is advisable and good reasons exist therefor. (Former Ed. Code, § 16801, repealed 1976, now § 39800.) This statute was not at issue in the instant case. Second, there was evidence in *Manjares* that the district could afford to provide transportation to the single group of plaintiffs. Here there was evidence that the district was financially unable to provide transportation to all displaced students who might request it. Third, *Manjares* involved a fixed group of students in a single location who were permanently assigned to particular schools and who, unlike similarly situated students, were not provided transportation. By contrast, the district's policy at issue here deals with a fluctuating group of students who reside throughout the district and temporarily attend a variety of schools for differing lengths of time. For these reasons displaced students are unlike the single group of district students who are provided transportation—a group of approximately 40 students who live in a specific neighborhood and who, for traffic safety reasons, are bussed to 2 schools that are within a few blocks of each other.

In short, we conclude that the district's policy concerning students who cannot immediately attend their school of residence does not warrant issuance of a peremptory writ. We do not imply by this conclusion, however, that we are unsympathetic to students who cannot attend their school of residence because it is already filled to capacity. There are a myriad of obvious benefits to attending a school close to home. On the other hand, even apart from teachers union contracts and state requirements, it is uniformly accepted that the smaller the class size, the better the education. The

convenience of late-registering students must be balanced against the education of an established number of students deemed the maximum appropriate size for its age group. To accommodate these competing interests, the district must be permitted some flexibility in configuring attendance zones and maintaining the schools therein to accommodate the demands upon its educational resources.

## II, III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed.

Peterson, P. J., and Champlin, J.,† concurred.

A petition for a rehearing was denied November 14, 1996, and appellents' petition for review by the Supreme Court was denied January 22, 1997.

---

*See footnote 1, *ante*, page 1793.

†Judge of the Napa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.