Filed 11/22/13  Doctors Med. Center of Modesto v. State Dept. of  Health Care Services CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DOCTORS MEDICAL CENTER OF MODESTO, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STATE DEPARTMENT OF HEALTH CARE SERVICES, <br><br> Defendant and Respondent. | B247614 <br><br> (Los Angeles County Super. Ct. No. BS133937) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert H. O'Brien, Judge.  Affirmed.

Hooper, Lundy & Bookman, Patric Hooper for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Niromi W. Pfeiffer and Frank S. Furtek, Deputy Attorneys General, for Defendant and Respondent.

_____

## SUMMARY

Doctors Medical Center of Modesto, Inc. ("DMC") appeals from a judgment denying its First Amended Petition For Writ of Mandate ("Petition"), arguing that under its Medi-Cal contract with the Department of Health Care Services ("DHCS") it is entitled to be paid the reasonable cost of the services it provides to care for R.W., a Medi-Cal patient, and alternatively arguing that DHCS's decision to reimburse DMC using the statewide median rate was arbitrary and capricious given the exceptional circumstances of R.W.'s case. Last, DMC argues that the circumstances of R.W.'s care are so unique that his care qualifies as a "taking" under the Fifth and Fourteenth Amendments, entitling DMC to just compensation. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Patient, R.W.

According to DMC's Petition, the Medi-Cal patient at issue, R.W., was hit by a car on September 23, 2006 and taken to the nearest trauma facility, which was DMC. R.W. was stabilized and transferred to the neurosurgery unit of DMC. Although medically stable and no longer needing acute care, R.W. nonetheless has been at DMC for the seven years since then.

Rather, as both parties agree on appeal, R.W. requires the level of care provided in a nursing facility or other long-term care facility.[1] According to DMC's Petition, despite its efforts, DMC has not been able to find a placement for R.W. As a result, DMC has had to make changes to his room, hire security and take other exceptional steps to accommodate R.W.

### II. DMC's Contract with the State

In or about May 2002, DMC and DHCS executed a written contract governing the provision of hospital inpatient services to Medi-Cal patients ("2002 Contract"). The

---

[1] R.W. has severe dementia as well as behavioral problems secondary to his acute brain injury and was placed under conservatorship by the Merced County Superior Court in June 2007.

2002 Contract defined in section 2.2 an "acute administrative day" as "days approved in an acute inpatient facility which provides a higher level of care than that currently needed by the patient (Title 22 of the California Code of Regulations, Section 51173)." [2] Appendix A to the 2002 Contract in turn listed "administrative day" as one of the "[s]ervices not provided by Hospital under this contract and are not reimbursable" but, according to a footnote, "billable only outside the provisions of the contract."

DMC has been reimbursed at the administrative day rate for R.W.'s care even though the actual cost of his care has been significantly greater. According to DMC's Petition the difference between payments it receives and actual costs incurred is over $2 million.

### III.    The Prior Petition

In October 2008, DMC filed its first petition for writ of mandate, which was subsequently amended, in Sacramento Superior Court against DHCS, the Department of Mental Health and the County of Merced, seeking to have R.W. removed and to be reimbursed for the cost of his care. The defendants demurred, the trial court sustained the demurrers without leave to amend and dismissed the petition. In November 2010, the Court of Appeal for the Third District affirmed the dismissal, finding that defendants did not have a ministerial duty to provide funds for placement of R.W. in any particular long-term care facility and noting that DMC could petition the Merced County Superior Court to compel R.W.'s conservator to pursue another, more appropriate long-term placement for him.[3] The Third District also found that DMC had not exhausted its administrative

---

[2] Section 51173 likewise states, "Acute administrative days means those days approved in an acute inpatient facility which provides a higher level of medical care than that currently needed by the patient." (Cal. Code Regs., tit. 22, § 51173.)

[3] We grant DMC's request for judicial notice of a June 6, 2013 ruling of the Superior Court of Merced County, denying DMC's petition for a writ of mandate to compel the Merced County Public Conservator's Office to initiate proceedings for a Lanterman-Petris-Short conservatorship for R.W. (*Conservatorship of the Person and Estate of R.W.* (June 6, 2013) Case No. P26140 Superior Court of California, County of Superior Court Merced.)

remedies for its contention that DHCS has a ministerial duty to reimburse the actual cost of R.W.'s care that exceeded the per day rate of reimbursement provided by Medi-Cal.

## IV.    The Current Petition

In order to exhaust its administrative remedies to comply with the Third District's opinion, DMC in December 2010 appealed its payment rate through the DHCS's grievance procedure. Specifically, DMC sent a letter to DHCS's fiscal intermediary, stating "[i]t is the provider's position that under the unique circumstances of this case, the Medi-Cal program should have paid the provider at a rate substantially greater than the administrative day rate paid during most of the period at issue." In March 2011, DHCS's fiscal intermediary responded, determining that DMC had been underpaid for administrative days during part of the period appealed as the rate used had not been timely updated but that other dates were "paid the maximum allowed amount by Medi-Cal and are not warranted additional payment."[4] Apparently counsel were unaware of the fiscal intermediary's letter and DMC's counsel sent an email contending that there had been "no decision." DHCS's counsel informed DMC that the appeal was "complete and should be determined to be final." DMC then filed the instant Petition.

On March 11, 2013, the Los Angeles Superior Court issued its judgment, denying DMC's petition, and finding that (1) DMC cannot allege either breach of contract or implied covenant because the rates at issue are not covered by the 2002 Contract between DMC and DHCS, (2) DHCS's reimbursement to DMC for R.W.'s care was consistent with Medicaid and Medi-Cal laws and therefore not arbitrary or capricious and (3) DHCS did not engage in an unconstitutional taking since DMC voluntarily participates in the Medi-Cal program. DMC appealed.

---

[4] We grant DHCS's request for judicial notice of a March 15, 2011 letter from fiscal intermediary, HP Enterprise Services, to DMC. In letter briefing, counsel for DMC contends that prior to the request for judicial notice, DMC counsel was unaware of the existence of the fiscal intermediary letter and DHCS and the Attorney General's office had never previously produced the letter. In any event, both parties agree on appeal that the administrative grievance procedure is either complete or the exhaustion requirement has been waived.

4

## LEGAL DISCUSSION

### I.      Writ of Mandate and Standard of Review

"Mandamus will lie to compel a public official to perform an official act required by law." (Code of Civ. Proc., § 1085.) Mandamus will not lie to control an exercise of discretion, i.e. to compel an official to exercise discretion in a particular manner. (*Helena F. v. West Contra Costa Unified School District* (1996) 49 Cal.App.4th 1793, 1799.) There are two essential requirements to obtain a writ of mandate: (1) a clear, present and usually ministerial duty on the part of the respondent, and (2) a clear, present and beneficial right in the petitioner to the performance of that duty. (*Mission Hosp. Regional Medical Center v. Shewry* (2008) 168 Cal.App.4th 460, 478-479; *California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 704.)

A party seeking review under traditional mandamus must show that the public official or agency abused its discretion; otherwise, the agency's action must be upheld upon review. (*California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 567.) In determining whether a public agency has abused its discretion to the extent that mandate will lie, the court may not substitute its judgment for that of the agency; and if reasonable minds may disagree as to the wisdom of the agency's action, the public agency's determination must be upheld. (*Helena F. v. West Contra Costa Unified School District*, *supra*, 49 Cal.App.4th at p. 1799.) Thus, the inquiry is limited to whether the agency acted arbitrarily, capriciously, fraudulently or without due regard for his rights. (*Miller Family Home, Inc. v. Department of Social Services* (1997) 57 Cal.App.4th 488, 491; *California Hospital Assn. v. Maxwell-Jolly*, *supra*, 188 Cal.App.4th at pp. 567-568.)

In reviewing a trial court's judgment on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's factual findings, but exercises its independent judgment on legal issues, such as the interpretation of statutes. Thus, to the extent that the trial court's decision does not turn on disputed facts, the Court of Appeal will review de novo the trial court's interpretation of the

5

provisions at issue. (*Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 243-244.)

## II. The Contract Claim

On appeal, DMC contends that the trial court erred in concluding that the 2002 Contract "imposed no duty on State DHCS with respect to administrative day services payment" and that "any reasonable interpretation of the contract leads one to conclude that relief must be made available to DMC under the terms of the contract" because of the substantial shortfall in payment.

We look to the language of the contract. (Civ. Code, §§ 1639, 1644.) As stated previously, Appendix A to the 2002 Contract lists "administrative day" as one of the "[s]ervices not provided by Hospital under this contract and are not reimbursable" and, in a footnote, provides that it is "billable only outside the provisions of the contract." Given this language, it is not surprising that the 2002 Contract section on payment provision includes dollar amounts for inpatient services and other types of care, but does not include any payment rate for administrative days. Thus, while DMC is correct that the 2002 Contract "expressly addresses administrative days and refers to specific procedures for submitting bills for such services", the reference is limited to language stating that the 2002 Contract does not cover payment for administrative day services and that such services need to be billed "outside the provision of the contract." In short, the plain meaning of the 2002 Contract language does not provide a basis for DMC's requested contract relief.

Even assuming arguendo, that payment for administrative day services was covered by the 2002 Contract, it does not support DMC's contention that it had not assumed the risk that its costs would be greater than the payments it received or that it is entitled to be paid its actual costs in furnishing administrative day services to R.W. DMC's argument that DMC at most could be presumed in the 2002 Contract to have agreed to accept the risk of furnishing administrative day services for "a reasonable period of time, such as the average time that a patient remains an administrative day patient in hospitals in Stanislaus County" would define the balance of risks so that DMC

6

would only assume the risk of patients who stayed the average number of days or less, but none of the risk for patients who stayed more than the average number of days, when by definition there must be an equal number of those days above the average as below. DMC does not cite to any part of the 2002 Contract that would support such a distribution of the risk and, in fact, the contract contains language to the contrary. In section 3.8 entitled "Assumption of the Risk", the 2002 Contract provides:

> The Provider shall bear total risk for the cost of all inpatient services rendered to each beneficiary covered by this Contract. As used in this Paragraph "risk" means that the Provider covenants to accept as payment in full for any and all inpatient services (Paragraph 2.6) payments made by the State pursuant to Article 4 of this Contract. Such acceptance shall be made irrespective of whether the cost of such services, transportation and related administrative expenses shall have exceeded the payment obligation of the State matured under the conditions set forth in this Contract. . . .[5]

While it is no doubt true that "[n]o one at DMC ever contemplated that Medi-Cal patients, including R.W., would continue to be treated at the hospital for more than six years while Medi-Cal paid an administrative day rate" which was well below actual costs, DMC has not pointed to any language in the 2002 Contract that supports its contention that it did not assume such a risk.

Finally, DMC suggests that DHCS breached the covenant of good faith and fair dealing. As such a claim is based on the performance and enforcement of a contract, it is inapplicable here. (See *Carma Developers Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371.) Moreover, to the extent DMC's argument is based on DHCS's manual on case management services and the contention that DHCS had responsibility for placing R.W. elsewhere, we note that the language of the manual

---

[5] This section does not address who bears the risk for the costs of administrative days since, as discussed above, the 2002 Contract excludes such days from its scope.

7

stating that case managers will work with hospitals and other providers "to ensure the appropriate and expedited authorization of medically necessary services" does not empower case managers to place patients with specific providers, but simply makes them responsible for facilitating the authorization process for payment for such services. Furthermore, as the Third District noted in the prior petition appeal, placement of R.W. in an appropriate facility is the prerogative of R.W.'s court-appointed conservator acting on his behalf.

### III.     The Arbitrary and Capricious Claim

DMC next contends that, if not governed by contract, "DHCS' decision to reimburse DMC using the statewide median rate for administrative day services was arbitrary or capricious" and the trial court erred in holding that it was neither. According to DMC, DHCS is required to "allow exceptions to its Medicaid payment rates in exceptional cases" and R.W.'s situation is just such an exceptional case. DMC also contends that DHCS's provider manual contains the "only rule directly discussing administrative day rates for contracting hospitals" as opposed to non-contracting hospitals and it states that they will be "cost reimbursed" and concludes that "DHCS' refusal to abide by the plain language of the provider manual is arbitrary and capricious."[6]

Because the amounts DHCS paid DMC for administrative days was consistent with federal and state laws regulating such payments, we conclude that the payments are not arbitrary or capricious. Both federal and state regulations address the payment for administrative day services. 22 Code of Federal Regulations part 447.253(b)(1)(ii)(B) states that: "If a State elects in its State plan to cover inappropriate level of care services (that is, services furnished to hospital inpatients who require a lower covered level of care such as skilled nursing or intermediate care services) under conditions similar to those described in section 1861(v)(1)(G) of the Act, the methods and standards used to

---

[6] DMC also argued that DHCS's failure to reach a decision or relief under the grievance procedure is arbitrary and capricious. However, as noted in footnote 4, *ante*, DHCS's fiscal intermediary did reach a decision on DMC's grievance appeal.

8

determine payment rates must specify that the payments for this type of care must be made at rates lower than those for inpatient hospital level of care services, reflecting the level of care actually received, in a manner consistent with section 1861(v)(1)(G) of the Act . . . ." Given the permissive language, Medicaid does not require Medi-Cal to cover "inappropriate level of care services" such as those DMC provides to R.W. But as Medi-Cal does cover inappropriate level of care services, it "must specify that the payments for this type of care *must be made at rates lower than those for inpatient hospital level of care services,* reflecting the level of care actually received." In essence, part 447.253 creates a cap on administrative day services set at the inpatient day rate, but with the caveat that the administrative day rate must be consistent with section 1861(v)(1)(G) of the Social Security Act.[7]

Section 1861(v)(1)(G) of the Social Security Act provides that when inpatient hospital services for a patient are not medically necessary but post-hospital extended care services are medically necessary (i.e. acute administrative days), the payment "*shall continue to be made under this subchapter at the payment rate described* in" the next clause, which in turn provides for a hospital like DMC without a skilled nursing facility unit, "is a rate equal to the estimated adjusted Statewide average rate per patient-day paid for services proved in skilled nursing facilities under the State plan . . . ." (42 U.S.C.A. § 1395x(v)(1)(G)(i) & (ii).)

California Welfare and Institutions Code section 14110.1 in turn states: "Medi-Cal reimbursements for long-term care in any hospital shall be at a rate not to exceed the

---

[7] We note that DMC appears to be seeking reimbursement for its administrative day services to R.W. at a rate higher than the inpatient rate it would have received if R.W. had needed its acute services. The 2002 Contract provided for "inpatient services provided to beneficiaries, the all-inclusive rate per patient per day of $970." After a series of amendments, in fall of 2007, DMC entered into Amendment No. 9 to the 2002 Contract, which increased "[f]or Inpatient Services provided to Beneficiaries, the all-inclusive rate per patient per day of $1,400" and also provided that "[c]ommencing September 13, 2008, for Inpatient Services provided to Beneficiaries, the all-inclusive rate per patient per day of $1,500." DMC claims its total costs as $2,853,855 for the period from November 1, 2006 to March 31, 2011, or 1,612 days, which would be a rate of $1,770 per day.

maximum rate paid for long-term care in nursing facilities which are distinct parts of acute care hospitals, except for patients whose medical or nursing needs exceed the level of care provided in nursing facilities." Pursuant to section 14110.1, DHCS promulgated regulations to address reimbursement for acute administrative days, stating that reimbursement for such rates "shall be" at the level of reimbursement paid to "nursing facilities that are distinct parts of acute care hospitals." (Cal. Code Regs., tit. 22, § 51542, subd. (a)(1).) The acute administrative day rate is the maximum rate paid to nursing facilities that are distinct parts of hospitals; a rate that is equal to a "median" of the projected costs of most distinct part hospitals that are participating in the Medi-Cal program. (Cal. Code Regs., tit. 22, § 51511, subd. (a)(2).) Thus, DHCS is limited under federal and state law to paying DMC the median or statewide average of projected costs.

DMC, however, argues that it is entitled to an exception to this rate, due to the exceptional circumstances of R.W.'s situation. Even assuming arguendo that DHCS had the authority to make payments in amounts greater than the statutorily prescribed rates, mandamus would not lie. A writ of mandate "will not lie to control a public agency's discretion, that is to say, to force the exercise of discretion in a particular manner." (*Helena F. v. West Contra Costa Unified School District*, *supra*, 49 Cal.App.4th at p. 1799.)

DMC also cites to *Memorial Hospital-Ceres v. Belshe* (1998) 67 Cal.App.4th 233 for the proposition that services furnished by a contract hospital which are not covered by contracts must be cost reimbursed. *Belshe* involved whether DHCS properly used the hospital's average overall cost rather than its psychiatric unit costs to compute reimbursement rates for uncontracted psychiatric services. (*Id.* at pp. 235, 238.) Unlike the hospital in *Belshe*, DMC does not have a separate unit for the service at issue. Under section 181(v)(1)(G)(ii) of the Social Security Act, if a hospital has a unit which is a skilled nursing facility unit, then its payment could be "allowable costs in effect . . . for extended care services provided" rather than only the rate based on the estimated adjusted statewide average rate. (42 U.S.C.A. § 1395x(v)(1)(G)(ii)(I).) Thus, under situations like *Belshe*, unlike DMC's situation, payments could be based on "allowable costs" and

10

not solely based on the statewide average. However, for a hospital like DMC that does not have a separate unit for the long-term care service, the only rate provided for by statute is the statewide average.[8]

Finally, according to DMC, DHCS's provider manual requires that it be paid based on its costs. The manual section states: "Contract hospitals billing for non-contract services such as administrative days . . . must bill these services on a separate *UB-04* claim form. These services are cost reimbursed, including associated ancillaries." We note that this manual section describes billing procedures and documentation required of providers to make claims rather than a section intended to establish payment rates. Moreover, federal and state regulations make clear that the costs must be reasonable based on the efficient delivery or services. (22 C.F.R. § 447.253(b)(a)(1)(i) ["The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred *by efficiently and economically operated* providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards."]; 42 U.S.C. § 1395x(v)(1)(A) ["The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services . . . ."].) As DMC notes, it is not an extended care provider and instead has had to make changes to his room, hire security and take other exceptional steps to accommodate R.W. Medi-Cal, however, is intended to pay for "efficiently and economically" provided services, not exceptional expenses such as those incurred by DMC. We conclude that DHCS's reimbursement of

---

[8] DMC in its reply brief and during argument also cited *Goleta Valley Community Hospital v. Department of Health Services* (1983) 149 Cal.App.3d 1124 as requiring DHCS to consider individual facility appeals of rates. *Goleta* is inapplicable. In *Goleta*, DHCS contended that certain interim rate reductions were not appealable and contended that the trial court erred in concluding that providers could seek relief via an administrative appeal. (*Id.* at pp. 1127-1128.) Moreover, the interim rates at issue were those calculated based on individual provider costs. (*Id.* at p. 1130.)

DMC for administrative days at the statewide average, as prescribed by federal and state statutes, is not arbitrary and capricious.

## IV.    The Takings Claim

DMC contends that the circumstances of R.W.'s situation are so unique that they constitute a taking under the Fifth and Fourteenth Amendments.[9]  The trial court held that there is no unconstitutional taking when a provider voluntarily participates in a regulatory program, citing *Managed Pharmacy Care v. Sibelius*, 705 F.3d 934, 950-951 (9th Cir. 2012).  In *Sibelius*, the Ninth Circuit held that Medi-Cal providers had no property interest in any particular reimbursement rate.  (*Ibid.*)  Instead the Ninth Circuit concluded that participation is voluntary and cannot support a takings claim, rejecting the argument that "state laws restricting the expulsion of patients" from skilled nursing facilities made Medi-Cal participation "compulsory" until alternate arrangements could be made.  (*Ibid.*)  We agree.

DMC, however, argues that there is "nothing voluntary about DMC's care and treatment of R.W." because the Emergency Medical Treatment and Active Labor Act ("EMTALA"), title 42 United States Code section 1395dd, and the corresponding California regulation, Health and Safety Code sections 1317-1317.9(d), require a hospital like DMC to admit a patient for emergency medical treatment and not to transfer the patient until the patient's emergency medical condition is stabilized.  But as DMC noted in its papers below, "[b]y November 2006, R.W.'s medical condition had, in fact, stabilized because of the efforts of DMC."  Thus, any "involuntary" aspect to DMC's participation in R.W.'s care under EMTALA ended in November 2006.

Because DMC voluntarily participates in Medi-Cal, DMC's takings claim is unavailing.

---

[9] In post-argument briefing, DMC also argues that "[i]n situations such as this, where [DHCS] has authorized and approved long term care placement for a patient," state regulations require "a detailed process for transferring the patient to a long term care facility."

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.

JOHNSON, J.