Filed 10/25/22 Farmdale Creamery v. Department of Food and Agriculture CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FARMDALE CREAMERY, INC., | C093013 |
| Plaintiff and Appellant, | (Super. Ct. No. 34202080003332CUWMGDS) |
| v. | |
| DEPARTMENT OF FOOD AND AGRICULTURE, | |
| Defendant and Respondent. | |
| SAVE QIP DAIRY FARMERS, | |
| Intervener and Respondent. | |

Farmdale Creamery, Inc. (Farmdale) appeals the trial court's denial of its petition for writ of mandate, in which Farmdale challenged the Department of Food and Agriculture's (department) directive to pay $363,053.85,[1] comprised of a $4,792.22

---

[1] The department ordered Farmdale to pay $364,367.39. In its petition for writ of mandate, however, Farmdale did not (and, on appeal, does not) challenge $1,313.54 of

Dairy Council of California assessment, a $72,609.22 California Milk Producers Advisory Board assessment, and a $285,652.41 Quota Implementation Plan assessment.[2] Farmdale argues it is not responsible for the assessments because it purchased the milk at issue from a milk handler (i.e., a dairy processor) and not from a milk producer (i.e., a dairy farm). The department and trial court, however, found the milk transactions were in substance producer-to-handler transactions and not handler-to-handler transactions. We conclude there is substantial evidence in the record to support the trial court's factual finding in that regard and the department's action was not arbitrary, capricious, or lacking in evidentiary support. We thus affirm.

LEGAL BACKGROUND

I

*Quota Implementation Plan Assessments*

Milk is assessable under the Quota Implementation Plan if it is market milk received from a California producer at a California plant. A producer is "any person that produces market milk in the State of California from five or more cows and includes members of cooperative associations." Market milk "means milk, cream, or skim milk, that is produced in conformity with applicable regulations of the appropriate public regulatory or health authority for disposition as market milk." To "[r]eceive milk" means "to convey milk physically into a milk plant where it is utilized within the plant, or stored within such milk plant and transferred to another plant for utilization."

---

that amount, which was imposed for certain Dairy Council of California assessments that are not at issue in this appeal.

[2] The parties and the trial court at times refer to these assessments as fees. We use the term assessment as provided in Food and Agriculture Code section 64301, the Quota Implementation Plan, and the Marketing Order for Research, Education, and Promotion of Milk and Dairy Products in California.

If the milk is assessable, the Quota Implementation Plan requires the assessments "be collected from the handlers of market milk." A handler is "any person who operates one or more plants in California or that engages in the operation of selling, marketing, or distributing in California of Bulk Market Milk he or she has produced or purchased or acquired from a producer." Bulk market milk is "milk, cream, or skim milk, other than packaged products, from market milk sources." While the assessments are collected from the handlers of market milk, "[a] handler that pays any such assessments for and on behalf of any producer may deduct such producer assessments from any money which is owed [to] the producer by the handler."

II

*Dairy Council Of California Assessments*

During the audit period at issue,[3] "[e]ach producer . . . [paid Dairy Council of California assessments] established for each hundredweight of milk produced by him or her in the state and delivered to a handler." (Former § 64302, subd. (a).) The "first handler that purchase[d], or otherwise acquire[d] possession or control of" the milk had to collect the assessments from the producer and submit the assessments to the department. (*Ibid.*) Handler was defined as "any person that, as owner, agent, or broker, or otherwise acquire[d] from a producer, producer-handler, or another handler, possession or control of milk, skim milk, or cream, in the form of unprocessed milk, skim milk, or cream, or in any other unprocessed form, for the purpose of processing it, and include[d] any person who secure[d] custom processing services on an ongoing basis." (Former § 64007.) "[A] handler that s[old] unprocessed milk, of which he or she ha[d]

---

**3** The pertinent Food and Agricultural Code sections pertaining to the Dairy Council of California assessments have been amended at different times. We discuss the versions of the code sections in effect during the audit period. All undesignated section references are to the Food and Agricultural Code.

3

the right to possession or control by contract or otherwise, to another handler, and deliver[ed] this milk in unprocessed form to this other handler or cause[d] this milk to be delivered to this other handler directly from the producer, [wa]s the first handler of th[e] milk." (Former § 64302, subd. (a).)

## III

### *California Milk Producers Advisory Board Assessments*

The department collects California Milk Producers Advisory Board assessments "from the handlers . . . who purchase or otherwise receive or acquire milk or milk fat from producers . . . . Each handler . . . who purchases or receives or otherwise acquires any such milk solids or milk fat for and on behalf of any producer . . . shall deduct such assessments from any monies owed by him or her to any such producer." Producer is defined as "any person that is engaged within this State in the business of producing, or causing to be produced, for market, milk as defined herein." Handler is defined as "any person, who, as owner, agent, or broker, purchases or otherwise acquires possession of or control of milk or milk fat from a producer . . . , in the form of unprocessed milk or cream, or in any other unprocessed form, for the purpose of processing it."

### FACTUAL AND PROCEDURAL BACKGROUND

Farmdale is a California milk processor, also known as a handler. In mid-2019, the department audited Farmdale's two processing plants. The department assessed Farmdale $364,367.39 after determining, in part, that "[p]roducer receipts were misreported as Handler receipts during the months of January through April 2019." The department explained, "[m]ilk from a California producer that is then received and utilized in a California plant must pay California assessments." Farmdale filed a petition for writ of mandate, challenging the assessment on two grounds.

First, Farmdale argued the assessments "were erroneously assessed because they may only be assessed on handlers' purchases of milk from producers" and, "[g]iven that GH Processing is a handler," Farmdale "was not required to pay assessments on milk

4

purchased from GH Processing." Second, Farmdale argued $285,653.41 of the assessment was legally invalid because the department did not adopt the Quota Implementation Plan "in conformity with the underlying statute" and, thus, the Quota Implementation Plan was void. Because this appeal concerns only the first ground of Farmdale's challenge to the department's assessment, we recite only the material factual background in regard to that assertion.

In the trial court, Farmdale argued it purchased the milk at issue in the audit pursuant to two contracts with GH Processing, in which GH Processing was designated as the seller. Farmdale produced two unsigned contracts identifying Gerben H. Hettinga as the signatory for GH Processing. Gerben Hettinga declared: he is the managing partner and a 50 percent owner of GH Diary; "GH Processing is an operating arm of GH Dairy and operates as a separate business with its own books of account, contracts and employees"; "GH Processing operates a processing plant [in] Arizona that purchases unprocessed milk from dairy farms for the purpose of manufacturing bottled milk in various sizes, cream in bulk and other sizes and condensed milk in bulk"; "[f]rom time to time, as is customary in the milk processing industry, GH Processing purchases unprocessed milk from dairy farms and sells that unprocessed milk to other handlers"; "[b]efore selling the milk to Farmdale in 2019, GH Processing purchased it from dairy farms"; and "[t]hose purchases were recorded as such on the books of account specific to GH Processing and treated as arms-length transactions, even when purchased from dairy farms owned by GH Processing's parent company, GH Dairy."

The department submitted the declarations of an auditor and the special assistant in its marketing services division. The special assistant declared he was "familiar with the Hettinga family, a family that owns a number of dairy farms, including California dairy farms. The Hettinga family also owns several processing plants." "The members of the Hettinga family that are currently active in the California dairy industry are Gerben Hettinga and his parents, Hein and Ellen Hettinga. The Hettinga-family [*sic*] owns

5

various GH and Hettinga dairy farms in Southern California." The department's contact person for GH Dairy and GH Processing is the same person, Gerben Hettinga. The special assistant declared GH Processing's reports to the department for January 1, 2019, through April 30, 2019, "d[id] not reflect the purchase of the milk that GH Processing purportedly resold to Farmdale under the GH Processing-Farmdale contract," even though such reports are required to reflect any milk GH Processing purchased from California dairy farms. He further declared the department interprets section 64001, known as the Dairy Council of California Law, "as applying to California producers and handlers" and the department does not collect such assessments from out-of-state handlers.

The auditor declared "[m]ilk processors are required to provide documentation reflect[ing] receipts and usage, including farm tags, receipt summaries component tests, contracts and other relevant materials for the audits." During the audit at issue, the auditor was "provided with boxes containing receipts and production records" and, "[a]s is the normal procedure during audits, the November and December 2018 boxes contained farm tags, which identify the dairy farm where the milk was picked up and the processing plant that the milk was delivered to." The farm tags for November and December 2018 revealed that Farmdale had received its milk from GH and Hettinga dairies in California, however, the total milk received from the California dairies for those months "agreed with Farmdale's reported totals from GH Processing." The auditor thus "concluded that Farmdale inaccurately reported milk as received from a handler, GH Processing, when Farmdale's farm tags and receipt summaries reflected that the milk was received from producers." The adjustments for November and December 2018 were, however, "made by the Department's operations staff before the audit was conducted" and were thus not included in the audit letter at issue in this case.

When the auditor reviewed the boxes for January through April 2019, she found the boxes did not contain farm tags from GH or Hettinga dairies. The auditor inquired

6

about the missing farm tags and Farmdale stated it decided to no longer keep farm tags from GH and Hettinga dairies. The auditor explained: "In an attempt to ascertain the source of the milk received by Farmdale, [she] reviewed all source documents provided, and discovered that Farmdale's 'Beta Lactam & Tetracycline Testing Daily Log Sheet,' which is used for testing each load as it arrives in the plant, listed each load received every day. The Daily Log Sheets reflected that several of the loads were scheduled as received from producers listed as 'HHD' and 'GHD'. Review of Farmdale's logs for the two prior months demonstrated that these initials stood for 'Hettinga Dairy' and 'GH Dairy,' dairy farms located in California. Several of the loads also listed the dairy numbers that prior receipts identified as California dairies. Although not all loads identified as 'HHD' and 'GHD' contained these dairy numbers[,] it was clear to [the auditor] that these dairies were all GH dairy properties based on past practices that [she] had observed and the pattern that Farmdale had established of identifying certain California dairies as 'HHD' and 'GHD.' While two GH Dairies located in Arizona were included in loads received, the log was not consistent in how it identified which GH dairies the loads were from. Therefore, it was not possible to separate the individual dairy receipt totals. Because Farmdale has the obligation to provide the Department with records supporting its claims that milk it received is not subject to assessment, and failed to retain the required information that would allow it to do so, [the auditor] adjusted all milk received from GH Dairies during the months of January through April 2019 to producer receipts instead of handler receipts as reported."

The trial court denied Farmdale's petition for writ of mandate. As to the Dairy Council of California and California Milk Producers Advisory Board assessments, the trial court ruled: "Farmdale maintains that it received all the milk in question from GH Processing, a handler. Evidence submitted with the opening brief indicates that GH Processing is indeed a handler and operates separately from GH Dairy and Hettinga Dairies. [The department] does not argue that GH Processing is itself a producer.

7

"Nonetheless, there is evidence supporting [the department]'s contentions that the arrangement between Farmdale and GH Processing was 'for show,' and that Farmdale was the first handler of the milk. First, as a handler operating in California's milk markets, GH Processing is required to submit, and does submit, the same reports that Farmdale submits to [the department]. Farmdale does not deny that, to comply with reporting requirements, GH Processing was required to identify any milk it resold in California, including the milk it purportedly resold to Farmdale. The undisputed evidence, however, is that GH Processing did not identify any resale of milk to Farmdale in reports it submitted for the period covered by the contracts. [Citation.]

"In addition, there is the evidence that Farmdale repeatedly attempted to hide evidence that raw milk it claimed to receive from GH Processing actually came from GH Dairy and Hettinga Dairies. Farmdale has not identified a justification for this concealment. A natural inference to be drawn is that Farmdale wanted [the department] to believe that milk was coming directly from GH Processing, not a California affiliate. If Farmdale had considered the contracts with GH Processing to be genuine, there would have been no need to conceal receipt of milk directly from the California dairies.

"Finally, there is evidence that Hettinga and/or his parents own GH Processing, GH Dairy and Hettinga Dairy [*sic*]. By itself, this evidence of overlapping and family ownership would not support a finding that GH Processing was merely a conduit for GH Dairy and/or Hettinga Dairies on the contracts with Farmdale. Nonetheless, it is evidence that Hettinga was in a position to exploit GH Processing, GH Dairy and Hettinga Dairies in order to make it appear as though Farmdale was obtaining milk from GH Processing rather than from the dairies. As a result, when combined with the other evidence, the common ownership of these entities supports [the department's] position.

"Given the evidence, [the department] did not act arbitrarily or capriciously by treating Farmdale as the first handler of the milk and, therefore, the party from which [*sic*] to collect the [assessments]. In reaching this conclusion, the court is aware of

8

evidence that Farmdale paid GH Processing for the milk it received from the dairies. The court, though, does not reweigh the evidence. Hence, some evidence that Farmdale performed on the contracts with GH Processing does not negate [the department's] position, based on other evidence, that the contracts were a cover for Farmdale's receipt of raw milk directly from GH Dairy and Hettinga Dairies.

"In its reply brief, Farmdale attempts to shore up its arrangement with GH Processing by asserting that GH Processing was the one that proposed contracting for raw milk. Farmdale asserts that it accepted the proposal only because GH Processing offered the lowest price for the milk. Farmdale does not explain how GH Processing – a middle man – could have offered lower prices than the dairies themselves. As a consequence, Farmdale's explanation for its contracts with GH Processing does not alter the outcome.

"Finally, the court invited counsel to discuss at oral argument whether, in the absence of evidence that Farmdale knew GH Processing never acquired the milk it purported to resell, equitable considerations would have precluded [the department] from levying [assessments] against Farmdale as the first handler. Neither side cited a case directly addressing this question. As noted above, there is evidence that Farmdale was aware of the scheme. But even if the evidence were otherwise, the court would uphold [the department's] treatment of Farmdale as the first handler. Farmdale is a sophisticated party and a regular participant in California's milk markets. As such, Farmdale is in a better position than [the department] to protect its interests and ensure that the liability for regulatory [assessments] is appropriately allocated in its contracts." (Fns. omitted.) In an accompanying footnote, the trial court noted "despite Hettinga's assertion that GH Processing memorializes its purchase of raw milk from GH Dairy and Hettinga Dairies in its separate books, neither Hettinga nor Farmdale produced relevant portions of such books to substantiate GH Processing's contractual sales of milk to Farmdale."

As to the Quota Implementation Plan assessments, the trial court reasoned: "For the same reasons it assessed the Dairy Council [of California] [assessments] and

9

[California] Milk [Producers] Advisory Council [assessments] on Farmdale, [the department] imposed the [Quota Implementation Plan] assessments on Farmdale as the first handler. [Citation.] Farmdale argues that the imposition of [assessments] was unauthorized because the [Quota Implementation Plan] designates GH Processing as the first handler. Article 1 in the [Quota Implementation Plan] defines 'handler' as follows:

" 'Handler' means any person who operates one or more plants in California or that engages in the operation of selling, marketing, or distribution in California of Bulk Market Milk he or she has produced or purchased or acquired from a producer . . . .

"In Farmdale's view, because GH Processing 'engages in the operation of selling' milk in California, it was the first handler liable for the [assessments]. But this argument overlooks the evidence discussed above, namely that GH Processing did not report the resale of the milk in question, Farmdale attempted to conceal the true origins of the milk, and Hettinga was in a position to exploit GH Processing and its affiliates. The fact that GH Processing is a handler does not command a conclusion that it acted as a handler on the transactions at issue." (Fns. omitted.) The trial court further noted "there is evidence that GH Processing did not actually sell any milk, and instead acted merely as a conduit for its producer affiliates."

Farmdale appeals.

## DISCUSSION

An ordinary mandate proceeding under Code of Civil Procedure section 1085 is "used to review [an] adjudicatory . . . decision[] when [an] agency [i]s not required to hold an evidentiary hearing." (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785.) In the trial court, "[t]he scope of review is limited, out of deference to the agency's authority and presumed expertise: 'The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.] . . . "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all

10

relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." ' " (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745.) On appeal from the trial court's decision, "the trial court's findings as to foundational factual matters are conclusive if supported by substantial evidence. Thereafter, the appellate court performs essentially the same function as the trial court -- it determines if the agency's decision was arbitrary, capricious or entirely lacking in evidentiary support, contrary to established public policy, unlawful or procedurally unfair." (*Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799.)

Farmdale asserts the trial court abused its discretion in finding "the arrangement between Farmdale and GH Processing was 'for show,' and that Farmdale was the first handler of the milk" (i.e., that the transactions were producer-to-handler transactions rather than handler-to-handler transactions) because the finding rested on "three inferences" that "veer[ed] into the realm of speculation and conjecture and so cannot be considered substantial evidence." In that regard, Farmdale attempts to parse and attack each of the three purported inferences individually.

First, Farmdale argues the "trial court got it wrong" when it inferred Farmdale violated the law based on GH Processing's failure to report the milk it purchased from California dairies. Farmdale asserts "the fact that GH Processing failed to file reports with [the department] on milk purchases supports the legal conclusion that GH Processing violated the law, not the inference that Farmdale violated the law." (Boldface, capitalization, & underscoring omitted.)

Second, Farmdale challenges the trial court's finding that "Farmdale's contract with GH Processing was not 'genuine,' " positing "evidence that California dairies shipped directly to Farmdale does not contradict the undisputed declarations accompanied by milk purchase contracts documenting that GH Processing purchased that milk from its affiliates from [*sic*] the dairies and then sold it to Farmdale," "there is no

11

requirement in law that a handler purchasing milk from another handler retain 'farm tags,' " and "the records from which [the department] concluded that the milk purchased by Farmdale from GH Processing had been delivered direct from GH Dairy and Hettinga Dairy [*sic*] were in fact made available by Farmdale to [the department] during the audit."

Third and finally, Farmdale asserts the trial court incorrectly inferred that the Hettinga family exploited the relationship between GH Processing, GH Dairy, and Hettinga Dairies because, at most, "the Hettinga family had the motive, desire and opportunity to exploit matters" but there is no evidence of them actually doing so.

We decline to analyze the trial court's finding that the transactions at issue were producer-to-handler transactions in the manner presented by Farmdale. Our review focuses on the record to determine whether there is substantial evidence to support the trial court's factual findings; we do not analyze or review each inference the trial court may have drawn in reaching those findings. At bottom, the question is whether there is substantial evidence to support the finding that the transactions at issue were producer-to-handler transactions rather than handler-to-handler transactions. The answer to that question is, "yes."

"Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.) " '[C]ircumstantial evidence and any reasonable inferences drawn from that evidence' may constitute substantial evidence." (*People v. Grant* (2020) 57 Cal.App.5th 323, 331.) When a finding of fact is based on an inference, it must be " ' "drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

One of the auditors declared that Farmdale misreported the source of its milk for November and December 2018; the farm tags showed Farmdale received its milk from

12

California dairies owned by members of the Hettinga family and not from GH Processing, as Farmdale had reported. Farmdale presumably knew the department caught the foregoing misreporting prior to the audit because the department's operations staff made the adjustments to Farmdale's November and December 2018 records before the audit was conducted. Farmdale then did not make farm tags available to the auditors for the milk deliveries in January through April 2019, even though the normal auditing procedure was for the department to review farm tags. While Farmdale produced copies of the purported contracts between itself and GH Processing, the contracts were unsigned, the milk was delivered directly to Farmdale from the same California dairies owned by members of the Hettinga family as had been done in November and December 2018,[4] and GH Processing never reported to the department that it purchased the milk at issue from those dairies (as it was required to do, if true). Neither Farmdale nor GH Processing produced any documents indicating the assessments were withheld from payments made to the California dairies (which would then be transmitted to the department). Given that Gerben Hettinga has a common ownership in GH Processing and GH Dairy, he certainly could have made such purchasing documents available, if they existed. The foregoing evidence supports the inference that GH Processing was merely acting as a conduit for the milk purchases between Farmdale and the California dairies and that the contractual relationship between GH Processing and Farmdale was not genuine.

Farmdale discusses four cases purportedly setting "limits to the inferences that a trier of fact may draw based on circumstantial evidence." (Citing *Reese v. Smith* (1937) 9 Cal.2d 324; *Estate of Bould* (1955) 135 Cal.App.2d 260; *Krause v. Apodaca* (1960) 186 Cal.App.2d 413; *Bergman v. St. Louis Southwestern Railway Co.* (1982)

---

[4]    In its reply brief, Farmdale expressly states it does not dispute "that the milk Farmdale purchased from GH Processing was delivered directly to Farmdale from California dairies."

13

134 Cal.App.3d 696.) We need not discuss the specifics of the cited cases because, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) We further do not address Farmdale's assertion that the department "mistakenly believes that it cannot collect the [assessments] in question from GH Processing." (Boldface & capitalization omitted.) We fail to see how the argument creates any dispute as to whether Farmdale is responsible for the assessments or the department's action was arbitrary, capricious, or without evidentiary support.

Having found substantial evidence to support the trial court's factual finding that the milk transactions were producer-to-handler transactions, it is clear the department's action was not arbitrary, capricious, or lacking in evidentiary support.

The Quota Implementation Plan assessment was appropriate because Farmdale received the milk directly from a California producer at a California plant. The Dairy Council of California assessment was not arbitrary, capricious, or lacking in evidentiary support because Farmdale was the first handler to "otherwise acquire[] possession or control of" the milk. (Former § 64302, subd. (a).) The trial court's substantiated finding that GH Processing acted merely as a conduit for the milk purchases negates any argument that GH Processing was the first handler because it sold "unprocessed milk, of which [it] ha[d] the right to possession or control by contract or otherwise, to [Farmdale], and . . . cause[d] th[e] milk to be delivered to [Farmdale] directly from the producer." (*Ibid*.) And, finally, the California Milk Producers Advisory Board assessment was valid because Farmdale "otherwise receive[d] or acquire[d] milk" from a producer.

## DISPOSITION

The judgment is affirmed. The department shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/_____,
Robie, Acting P. J.


We concur:


/s/_____,
Mauro, J.


/s/_____,
Krause, J.

15